The next case is number 2010-1429 IMPOSINT SA v. H LUNDBECK. Mr. Galbraith. Thank you, your honor. May it please the court. The district court's fundamental error in this case was to substitute its own view of the facts for the facts as the jury must have found it. You're talking about the Jamal piece then, not the summary judgment? That's correct. I want to address the Jamal piece first. That was the focus of the trial, the summary judgment having been decided before trial. The jury's finding that the invention would not have been obvious carries with it an assumption that the jury resolved all the factual inferences, all the factual issues in favor of that verdict considering the parties' burdens of proof. So what are the underlying factual issues that you think are relevant here? The underlying factual issues are what does the prior art teach a person skilled in the art? What does the Forney references actually teach someone who read them at the time? Now the district court found that the Forney reference anticipates, the Forney 1970 reference virtually anticipates, found that it did anticipate the Claim 24, a finding that the jury explicitly rejected. The jury said no to that question. Even if the district court was wrong to say that both 1970 and 1971 contained every single element, the district court doesn't have to find just one prior art that contains every element in order to find something to be obvious. Isn't that right? That's correct, Your Honor, but this was a basis for the district court's finding. The district court's holding of obviousness was its finding in contradiction to the jury's verdict that every element was found, every element of Claim 24 was found in each of those references. Whichever one, Claim 24 now? We're talking about Claim 24. I'd like to, yes, if there are questions about Claim 24, I'll certainly address them, but my focus is Claim 24 right now. Well, they have the two references, the 1970 and the 1971 Forney references. That's correct. Are you suggesting that the issue before us isn't whether or not in combination the patent was obvious, the claim was obvious? There are several issues before the court. One is whether the claim would have been obvious in view of the findings of fact that the jury must have made in reaching its verdict to the contrary, that it was not obvious. And that verdict carries with it, as I say, a resolution in favor of implicit on every factual issue that was disputed at the trial. The first factual issue you mentioned was you said that Forney 1970 would teach the invention of Claim 24. Forney 1970 is a different process. It is a process that's carried out in a different reaction medium. There was testimony to that effect. It was carried out, there was evidence that actually carrying out the Forney 1970 reference didn't work very well. So what are the other factual determinations that you think we need to infer that the jury made? I think we need to infer that the jury, first of all, did not buy the testimony of the defendants that Forney anticipated or even rendered obvious the claimed invention. Well, that's an ultimate legal conclusion, correct? And secondly, one other important issue was the issue of unexpected results. There was testimony in the record that the patented process of Claim 24 produced unexpected results. That testimony was not challenged. The district court rejected it. The jury, it must be presumed, to have accepted it. Dr. DeLosta compared his invention to the prior art, discovered that it produced a higher yield, higher purity, did not produce the noxious gases that were associated with the prior art, and did not explode as the Forney 1971 reaction had done. Are you saying that there's any evidence in the record to support a jury conclusion that that's the end of the inquiry, or isn't it supposed to be that there has to be substantial evidence to support the jury? There has to be evidence from which the jury could have made the conclusion it did. That is, it could have concluded, reasonably concluded, that defendants had not proved the facts they were trying to prove by clearing convincing evidence. I think the substantial evidence standard has to wrap into it what the defendant's burden of proof on all these issues is. So the defendant's burden was to prove the facts by clearing convincing evidence that they relied on to establish in validity of this claim. But what was missing from 1970 and 1971? What was missing from 1970, what Forney 1970 taught, was a process for making this material that was carried out in liquid pure sulfur trioxide. Forney 1970 also contained within it a discussion of a prior process, and that was carried out in oleum, which did not produce a phthalide. It started with a different starting material. So it contained two teachings.  Two, it distinguished away the use of, I'm sorry, carried a process in sulfur trioxide and distinguished the use of oleum, which is what the claim process uses. So you're saying that we need to assume that the jury concluded that LeBlanc, because it was referred to in Forney 1970, concluded that Forney 1970 actually taught away from the use of oleum? It wasn't just that LeBlanc said that. There was testimony explaining this issue to the jury. But that was in Forney 1971, right? That particular limitation is in Forney 1971, right? In Forney 1971 is a different study. Forney 1970 basically describes a process. Here's a new process. Forney 1971 is saying, here's a study of a reaction mechanism. So what is, I think this was Judge Gallardo's question if I understood it, what is not in Forney 70 and Forney 71? Forney 1971 contains a series of experiments done at, they're all done basically the same way, in a sealed up reactor at a high temperature, 150 degrees, which is outside. Yeah, but the open reactor is in 70. We're talking about combining the two references. So what is in neither? You're right. That's not in 71, but it is in 70, right? If you can, you can certainly pick pieces from both references and combine them together. Right. And you can cobble together. Well, that's usually typically what happens in the obviousness analysis. That is correct. The question here is why would one do that? There's still, notwithstanding KSR, there's still a place in patent jurisprudence for some motivation to do what the inventor did or to combine the particular references, and there really isn't any here. Well, there is. You might reject it, but there is. There's the notion that there were practical problems working with pure sulfur trioxide and that that was the motivation to reach the 30% level in Forney 71. Well, the Forney 71 on its face doesn't talk about using 30% sulfur trioxide for that reason. I thought that wasn't it. Go ahead. I thought Table 2. Table 2 records that experiment, but it doesn't say we're using that because we're afraid of sulfur trioxide. Dr. Forney or Mr. Forney patented his process. No, you're saying the motivation isn't particular. I didn't want to suggest that the motivation is articulated specificity in Forney 71. We're just talking about the motivation to combine. The words are there. The table is there. The experiment is there. The question is why take that and combine it with something else that's different, and there is no suggestion, certainly, from the prior art itself. I think that's conceded. There's no suggestion to combine those teachings. Doesn't Forney 1970 itself say that the byproduct that was created there could be reduced by increasing this up to 20%? The Forney 1970 has both references discuss an issue where if you do it in dilute oleum, you get a bad product, basically from the point of view of what's sought here. In Forney 1970, the testimony was, when he's talking about 20% sulfur trioxide media, the testimony from our expert, which differed from the testimony of the other expert, was that that's a reference to how much sulfur trioxide is in the total reaction mixture rather than a reference to adding 20% oleum. Okay, so you're saying that that 20% was not with respect to a starting point but with respect to what ultimately was created post-reaction? No, that was how much of the reaction mix was actually SO3, was 20%. That was the testimony of Dr. Gokul. That's the way he read it as somebody skilled in the art. And indeed, the defendants themselves, before they had the motivation that this lawsuit gave them, interpreted the Forney references exactly the way we interpreted them. They told the Patent Office, in trying to obtain a patent, that their process, which is actually claimed more broadly than the Inficent Process, was distinguishable from the Forney 1970 reference for the very reason we're talking about. The Forney 1970 reference says, use SO3, their process, which is similar to Inficent's, use oleum. That was a big distinction in their view. We agree with that. But oleum was created by the reaction, wasn't it, in Forsey's 1970? There was dispute about exactly what happened in that reaction. Nobody's done that. It's seen what's created. That's not what the claim is talking about. The claim is talking about starting with oleum and combining it with the reactants. It's not talking about something created in situ. The claim requires an adding step. That's clearly an error by the judge, I believe, to equate the adding of oleum to the creation of oleum, even if it happens in a reaction. And Dr. Gokul said somebody skilled in the art would not read Forney that way, would not read reaction medium to be anything that's created during the reaction. And he thought it would be a minor amount. Nobody's done this experiment. This was a theoretical calculation done by the other side's expert. Mr. Galbraith, do you want to reserve some of your rebuttal time? Yes, Your Honor. Thank you. You have three minutes. Mr. Arminian. Thank you, Your Honor. May it please the Court. I think the best place to start is with Judge Prost's point that what we're talking about here is an ultimately legal conclusion. Are these two claims obvious as an ultimate legal conclusion in a case where we have the prior art undisputedly existing? That the Forney references themselves are prior art is undisputed. That the 513 patent application that showed making citalopram from 5-carboxythalide is prior art is also undisputed. There were two other pieces of prior art. The Merck Index, also undisputed prior art. Can you explain to me how this case went? Things went down. I mean, initially you get summary judgment on the claims. In other words, there's only one thing left in dispute in Claim 24, and that's the open reactor. And then the parties decide they're going to relitigate all of the other issues, which I thought had been already adjudicated in summary judgment. Am I wrong about that? Is it a practical matter? That's what you all let happen at trial, which is why we've got this question here? Absolutely. Your Honor is right. There was a summary judgment on Claim 21. We asked on behalf of Forrest and Lundbeck for the findings of fact in connection with the summary judgment to be found to be binding and to stop Inficent from relitigating them. That was not granted by the district court. So we ended up having to litigate Claim 24 as a whole and not following- But the district court didn't deny it. You just stipulated and then withdrew that request, didn't you? What happened is we proceeded and a judge said he wanted to go forward with the trial on Claim 24. We had to try it as a claim as a whole, following this court's precedent and Supreme Court precedent. We presented as a whole. There was a request pending throughout for there to be in the pretrial order adjudicated, stipulated facts that would go to the jury as adjudicated, stipulated facts, and those included the things that the district court found in the summary judgment. But you withdrew it. It was denied is my best recollection of the record, Your Honor. The record doesn't show that it was denied. It was denied. It shows that you withdrew it. If I recall, Judge Kaplan telling me, he said, at this point I don't want to add more facts to the record. The jury has enough to consider. And so we took, having already moved for judgment as a matter of law, he wanted the case to go to the jury. It did, in fact, go to the jury. The jury found non-infringement of six processes, infringement by five. They did not find invalidity. We filed our judgment as a matter of law. We renewed it. And Judge Kaplan, on the renewed motion for judgment as a matter of law, he credited Inficent with all possible factual findings in their favor. Well, no, he didn't. No, he didn't. Come on. Because there were factual. We have to assume that the jury made factual findings. And we would have to assume that, for instance, that the jury believed Dr. Gokul's testimony with respect to what a person of reasonable skill in the art would have understood from the 1940-1970 reference. He actually came right out and said that each one, 71 and 70, essentially anticipated that every single element of the claims were found in each one. That's clearly wrong, right? I mean, you even concede that in your brief, that that's wrong. I believe what Judge Kaplan was trying to convey was the five carboxythalide steps. We have not contended in this appeal that the making citalopram piece is shown in 40-1970 or 40-1971. I believe what Judge Kaplan was addressing was those references showing all the steps for making five carboxythalide. In a separate part of his opinion, he explicitly addresses taking that five carboxythalide and then making citalopram, and he cites the 513 application. So what we look at here is Judge Kaplan gave them the inferences to which they were entitled. There's one on which he said there was unimpeached testimony by Dr. Williams, and under this Court's Integra case, he was entitled to take a view of that, and that was the evidence where Dr. Williams said, if you run 40-1970, you will produce oleum, and that's going to show use running the reaction in oleum. But Dr. Gokul testified that yes, it produces oleum, but that's a byproduct. That's very different from what the art is teaching, and so Dr. Gokul specifically disagreed on that proposition, but the judge didn't buy Dr. Gokul's testimony. Is that the judge's role on a JMO? What the judge did is he credited the fact that water was produced in the reaction. No one disputes that fact. There's a minus H2O right in the 4070 paper. Dr. Gokul didn't dispute it either. What he looked at was what was the effect of that fact, and Dr. Gokul said, well, the effect of that isn't much. Judge Kaplan said, well, there is an effect to that. It shows that the reaction works in oleum, and in any event, oleum is clearly showed to work in 40-1971, and there was one thing said in the opening statement that 40-1971 only reacted in closed conditions. That's actually incorrect. If we look at the record on page A5735, that is a second set of reactions in 40-1971 that shows the reaction in oleum to produce 5-carboxyphallide, and the undisputed evidence was that that reaction was run open, and it produced 5-carboxyphallide, and in particular, we look on that page, it says under methods. What page are you referring to? It's A5735, Your Honor. If we look in the methods section of that page, it says the preparation of phthalides from phthalic acids, so 5-carboxyphallide is a phthalide, and it's produced from a phthalic acid, specifically terephthalic acid, was carried out according to the method described in the reaction with terephthalic acid, and it cites footnote 5, and footnote 5 is Forney's 1970 paper. So if we look at Forney 1970 and Forney 1971 in combination, which, Judge Garza, I think was your point, that we have to look at both of them. We can't just take one and do an isolated anticipation analysis and then look at the other and do an isolated anticipation analysis. We have to look at them together. My problem is the posture we're in here. It may very well be, if we were the initial triers of fact, that we would agree with you that if you look at all these underlying issues, that we would resolve the facts in your favor. But in this case, we're supposed to assume that the facts were actually resolved against you, that, for instance, the jury determined that Forney 1970 did not really teach this, based on Dr. Vogel's testimony that oleum was not the reaction's medium. And we're supposed to assume that the unexpected results that the jury concluded, despite the judge's disregard of that or disagreement with that, that the jury concluded that there really were unexpected results here. And we need to assume that there are underlying facts that support this decision. And our job is to go through the record and find not the contrary facts, but to see if there's any facts, substantial facts, that would support what the jury did, even if we would disagree with it. If we look at that, Your Honor, we have to credit the jury for deciding in impotence's favor on any issue for which there is substantial evidence, as Your Honor pointed out in the opening argument, and where there is testimony where someone is flatly misconstruing the words on a page of a prior art reference, that's not substantial evidence. Where here we have somebody who submitted test results that don't compare to the closest prior art, that's not substantial evidence under this Court's precedent. It's also where, as here, we've got no nexus to the claims that's coextensive. There was a reaction here at 130 degrees. The claim temperature range is 120 to 145. Not coextensive. Under this Court's precedent, not enough nexus. It's not substantial evidence. If we look at the claims, there's open non-pressurized reactor, which the Court construed at inference request to mean any conventional reactor up to 7 times atmospheric pressure. So quite a lot of pressure, just not a special pressure reactor. Here, the test results they submitted were conducted in an open flask, open to the air in a laboratory. So again, not coextensive with the claims, and under this Court's precedent, not substantial evidence. So when we look at it, there was no substantial evidence on which a reasonable jury could find this set of claims, these two claims, were non-obvious. If we look at this Court's precedent, for example, in the Boston Scientific v. Cordis Corporation case, there the technology was coatings for drug-eluting stents. And what this Court said is, quote, Obviousness is ultimately a question of law that this Court reviews de novo. When we consider that, even in light of a jury's finding of fact, the references demonstrate an invention to have been obvious, we may reverse its obviousness determination. And that was 554, Fed Third, at page 990. And that's what Judge Kaplan properly did here. He looked at this Court's precedent, where this Court has said, If you're just combining things that were known, that's not patentable. This Court has said that in a number of cases. If we look at the Muni Auction case, it said it. Perfect Web has said it. Ball Aerosol has said it. And the Wires case has said it. This Court has also been very clear, If you're just implementing a predictable variation of the prior art, that's not enough. This Court has said it with respect to the cardiovascular stents, like I just mentioned in the Boston Scientific v. Cordis case. It's also said it in a case where they were spraying antimicrobial treatments on poultry. And that was the Ecolab case, 569 F Third, 1335. There is here, it's interesting, because there was a concentration limitation, there was a time limitation, and there was a pressure of spraying limitation. One reference showed the first two, the concentration and the time, and it was admitted that the other factor, the pressure of the spray, was in the prior art. And what this Court found is that's a predictable variation. It's not enough. This Court has said it time and time again. So here, at most, you're looking at forming, creating a menu of options for how you make 5-carboxy-phthalate, telling you the right temperature range, running it open and closed, and showing that both work. He's giving you everything you need to know to make 5-carboxy-phthalate. And Judge Coates, as you say, when given all those choices, you want to use the reaction that doesn't have the very dangerous pure SO3. You want to use the safer, more conventional oleum. And you want to stay above 20 percent SO3, because as Judge O'Malley points out, Forney in 1970 tells you if you go below that 20 percent, you get an impurity. Then we look at, well, how do you get from there to citalopram? The 5-1-3 application says very clearly that they started from 5-carboxy-phthalate, went to citalopram, and they say that the 5-carboxy-phthalate could be made by well-known procedures. And at that point, this reaction that Forney had run was better explained than any 5-carboxy-phthalate reaction out there. Let me ask you about your own patent application. Your opposing counsel is correct that you, in fact, distinguished your claims over Forney in 1970 by saying that Forney in 1970 doesn't use oleum, and that there's no teaching in Forney in 1970 as it relates to oleum. Did you address Forney in 1971 to the PTO? Did you disclose 1971 to the PTO? So if we look at the application, at that time, I don't believe Forney in 1971 was vigorously discussed. The Patent Office didn't credit this one statement about what Forney in 1970 did or did not disclose. What the prosecution turned on was the use of paraformaldehyde as opposed to trioxane with respect to Lundbeck's patent because it was shown that paraformaldehyde didn't obstruct the equipment. But what I would suggest is, number one— When you say it wasn't vigorously discussed, was it disclosed to the PTO in 1971 or not? So we'd have to get you the record site, which we would, Your Honor. It'll be on the references cited section, right? If we look on the front of the page, the references cited. It's not there, is it? If it's there, it was disclosed, and if it's not, it had not been. Okay. And if this was so obvious to the world, why is it that the PTO, kept it a secret for so long? So a couple of points on that. Number one, the record evidence was that they did not. They actually disclosed it for the Inspectorate of Pollution in the U.K. in 1994, and they said they were using oleum. But the trial judge made a contrary finding on that, correct? He made a contrary finding at the summary judgment stage. It was never made a binding finding of fact. We put in more evidence about the public indexing and availability of the study at the trial, and it was found, and the judge mentioned it, this was another disclosure of using oleum by Lundbeck. What I would come back to is, under this Court's Weyers decision, which cites Supreme Court precedent, since Inficent is trying to claim a monopoly not just as against Forrest and Lundbeck, but against the public, they can't be stopped, and they're not stopped, from arguing and asserting the obviousness of Inficent's claims, despite what they may have argued below. But I plan to make two points, if I may. The arguments below were all before KSR issued, and this Court's ample precedent interpreting KSR, about how predictable variations are no longer patentable, how about common sense can be used to find a motivation, common sense like using a less dangerous reactant. So that was before this Court's precedent. Number two, I would point out that in the Danish priority application, it doesn't say pure sulfur trioxide for 4070, it says oleum, and that's in the record at page A3319. So when we go from the Danish priority application to U.S. application, I can't say, but what we know under Dwyer's case is it's not binding or an estoppel, either on Forrest Lundbeck or this Court, and that when we look at the record in the Danish priority application, it was said correctly that 4070 has oleum, and last but not least, the patent office in granting Lundbeck's patent didn't rely on any discussion of what 40 does or does not disclose, it relied on paraformaldehyde not obstructing the equipment, whereas trioxane did obstruct the equipment. Any more questions? No. Thank you, Mr. O'Meara. Thank you, Your Honor. Thank you, Your Honor.  It is true that in the summary judgment phase, the district court ruled on summary judgment that various items were found in the prior art and found that Claim 21 invalid for that reason, but Claim 24 is a separate invention. It has to be considered as a whole and not simply as Claim 21 with something added to it, and so as if to litigate Claim 24, we have to pretend that Claim 21 was out of the patent, and I think that's what the judge did in the trial, although we submit that in his opinion he reverted back to treating Claim 24 as simply an add-on. I don't believe it would have been appropriate. He corrected his error. I think he corrected his error and then reiterated his error. Let's put it that way. Did you ever ask the judge for a special verdict that would have tested some of these fact findings? We did not, Your Honor. The verdict form was heavily negotiated. This is kind of the way it came out. I don't remember all the details of what the parties asked for, but I don't believe we did. With respect to the – what Mr. Arminio mentioned was a reaction drawn in the Forney reference, and this is the issue with relying on lawyers with all respect, like myself or like Mr. Arminio, to interpret these references. The testimony was, and it's clear from this drawing, that the principal product of this reaction is the wrong product. The principal product of this reaction done in an open condition, page A5735, is the wrong product. And for that reason, Dr. Gokul submitted that that would have been a deterrent to going that direction rather than a teaching to go in that direction. And the jury is entitled to accept that testimony and must be presumed to have done so. With respect to the patent application, the patent that Lundbeck obtained, Lundbeck's inventor testified he was aware of both Forney references when he filed his patent application. He testified that he submitted a declaration saying neither of them disclosed his invention. And his trial testimony was that he indeed did, that Lundbeck indeed did keep that process as a trade secret, required all their suppliers and everybody who viewed it to sign secrecy agreements. Finally, with respect to the weight to be given that patent application and the statements made, the jury was instructed on that issue that they could treat that patent application, the fact of obtaining that patent or filing that patent application, as a secondary consideration. There was no objection to that instruction. So I think that's law of the case now, what that instruction was and what the jury could have done with that. Thank you. The case is submitted.